FILED
JUL 17 2014
MICHAEL C...
CLERK OF COURT

IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

No. 14-2072

**UNITED STATES OF AMERICA**

Appellee

-vs-

**LAURA DeJONG,**

Appellant

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
The Honorable Dean Whipple, District Judge

**APPELLANT'S BRIEF**
**("Anders")**

**LAURA DeJONG, MO**
8800 Timbercreek Lane
Pleasant Valley, MO 64068
**APELLANT**

# SUMMARY

This is a summary of the trial told from my point of view. I want to begin by saying this brief has received no legal advice, and has been done through the help of my family. I'm still detained at a detention center and have no access to computers.

Before getting into my arguments, I think it should be known that I requested for a new attorney, as I was not satisfied with the outcome of my trial. Since the trial I have only heard from my lawyer about the extension of this brief.

I have two main arguments for my case.

**Argument 1:**

felt not entirely represented throughout my trial with being represented by three different lawyers, as well as feeling Jonathan Laurans did not give effective assistance of counsel throughout the process.

**Argument 2:**

My sentence was almost double what was in my plea agreement and what was predicted by the PSR.

# TABLE OF CONTENTS

| | |
|---|---|
| SUMMARY | ii |
| TABLE OF CONTENTS | iii |
| PLEA AGREEMENT | 1 |
| TRIAL | 2 |
| MY CRIME | 3 |
| ISSUE 2: NOT RECEIVING PROPER REPRESENTATION | 4 |
| THE CONTINUANCE | 7 |
| SUMMARY | 10 |

# The Plea Agreement:

On June 18, 2013 the Plea Agreement was completed in court. I had discussed the agreement with attorney Ron Hall and was advised this was the best plea for the least amount of sentence. Although I signed the plea agreement knowingly and voluntarily, I had no knowledge of a clause in the Plea Agreement or had any discussion from my legal counsel on the fact that I could not appeal unless sentenced for more than 20 years. If I had known about the clause I would not have signed the Plea Agreement.

On June 18, 2013 the forfeiture case was also concluded on the same day in court that I signed the plea agreement. By no longer fighting forfeiture, I was advised it would help in reduction for sentencing. It also closed the civil case against me by my victim. All legal advice for the Plea Agreement and the forfeiture case was given by attorney Ron Hall and prosecuted by Jane Brown. The Honorable Judge Whipple called both counsels back to chambers to discuss the signing of the forfeiture prior to the hearing. Judge Whipple also discussed with me what I had signed of the forfeiture. I was advised by the counsel that I had no other

1

choice than to sign, because I would lose it all anyway, but this would help my sentencing.

## THE TRIAL

During my trial, Mrs. Brown kept bringing up my gambling and that I continued to go to the casino even after confession of my crime. While it is true I did go to the casinos, but I did not gamble. Since I was ranked a "high roller" I received benefits that lasted for a year which entitled me to free meals. Since all assets had been seized and with no money coming in, this allowed my family and I to eat. Also with the humiliation of my crime and not wanting to see anyone I knew, it was a place to go where no one knew me and where we could just eat dinner. One case Mrs. Brown might be arguing is about a Christmas Party Dinner at the casino right after my confession on November 30, 2011, to which I went to for the dinner. There was a raffle at this dinner to which I had the winning ticket at my dinner plate. The winning ticket was for $1000.00 cash to which I received a 1099 for. The 1099 clearly stated Christmas Party and 2 days later I received a phone call from my first attorney, Eric Vernon to stop going to casinos. I informed him of what

2

happened and that I had not gambled. I also gave Ron Hall this 1099 for the amount won.

## MY CRIME

To my employer I was a trusted and valued employee, but even with being this valued, trusted employee I was not in the pay scale of the higher bracket of employees. My salary was a middle range of the company's employees.

The owners could have accessed the bank statements from my crime at any time. They were never hidden. I kept the statements in a file cabinet along with year's prior statements in banker boxes clearly marked "Bank Statements." Also there were many times I was not working for a week or 2 weeks at a time. This meant Bank statements would arrive with photocopies of checks in the mail that were received by the company's owners.

The first time I check kited, I had informed the owner that I had done it to cover payroll. The next time it was done after I received a call from UMB bank stating they had received a garnishment for $25,000 from the IRS for payroll taxes. In order to cover this I started the check kiting to cover the shortage in hopes of receivable money coming in to

3

cover. I also continued it for the coverage of receivables so the company could purchase material. I do know looking back if it had not been for my deceit the struggles wouldn't have been there. But I feel that the banks should have contacted the owners of the company about the garnishments, instead of a person who is not a signer on the company's account.

I was also advised by the owner to change deposit dates to show accounts receivables at a higher percentage so the ratio was correct for the company's line of credit. The money was received and deposited, but not shown on books until after the month ended to overstate receivables. The owner knew about all of this and had advised this to not have to deal with a call from the bank.

## Issue 2: Not receiving proper representation from lawyers:

During the course of litigation, I had three different lawyers. The first, Eric Vernon, followed by Ron Hall, whom passed away during litigation, and followed by my current attorney, Jonathan Laurans.

During my litigation, I gave Ron Hall a couple of letters of remorse and explanation of my crime to which none were ever forwarded. I also

4

returned to Mr. Hall the last two paychecks I received from the company that I had not cashed. These checks were included on my W2 from the company. I also had SEP Deduction money on my W2 for 2011 and 2010 to which none was deposited into my SEP account. I know all of these would fall under forfeiture, but feel at least the amount should be accounted for. One month of Health Insurance was also deducted from my paychecks, but my employer canceled the Health Insurance. This amount too should be accounted for.

Throughout my litigation nothing was ever brought up as to why a person at this age who never had been in trouble would turn to do this crime except to my attorneys who seemed not to care. In my whole life I have had 2 tickets and no crime history. I never touched drugs at all and only drank alcohol if I went out to dinner. To turn to this crime there had to be a reason, which was explained to my attorneys but never brought out. At sentencing I had prior sent my attorney Mr. Laurans a letter to give to Judge Whipple. Mr. Laurans had told me that any letters would not help, but I gave him one anyway as I knew I would not be able to control my emotions on that day of sentencing. Mr. Laurans never forwarded the letter on to Judge Whipple, nor did he bother to bring up the remorse I always had discussed with him. I also presented Mr. Hall

5

Appellate Case: 14-2072    Page: 8    Date Filed: 07/17/2014 Entry ID: 4177658

and Mr. Laurans with letters of remorse I had written for my victim, which were never sent.

I had always requested that the whole story of my crime be told, but it never came out. I cannot go back on Mr. Hall because of his untimely death, but Mr. Laurans always informed me that nothing I did mattered.

In my discussions with Mr. Laurens I felt I was just a case to get rid of since all litigation had been done. In my earlier discussions with him I would repeat what I had been told by Mr. Hall and Mr. Laurens would tell me that Mr. Hall had no control and I was asking for the world. I was just repeating what I had been told. Mr. Laurans told me if it had not been for the respect of Mr. Hall, I should have been jailed from the beginning. Mr. Laurans said all I ever did was ask and ask, when my only request was when I received my first sentencing date. Mr. Hall had told me the last time I'd spoke with him that in July after my PSI information hearing I should go home and enjoy my family, as nothing else would happen until after the holidays. He said nothing would happen until the 1st of the year. This was what I had been told by legal counsel and by repeating it to Mr. Laurans, I was asking the world.

6

## THE CONTINUANCE

The 1st sentencing was continued until February 5, 2014 to which close to this sentencing date, my middle son had become very ill. The doctors said he was only a couple of days away from death when we brought him to the hospital. I composed a letter that I sent to my husband's attorney Ronna Holloman-Hughes, probation officer Kimberley Peete, and Mr. Laurans that I asked be forwarded to Mrs. Brown and Judge Whipple asking for a continuance.

Mrs. Brown sent back a reply that she was sorry for his illness, but felt if granted it would be a continual request. Mr. Laurans did not respond to my letter until two weeks later, to which he stated a note from my son's doctor might help. Upon a week after this conversation with Mr. Laurans, my son went back to the hospital again, but he was able to furnish us with a note of his diagnosis. His request was for this diagnosis to only be shared with our attorneys, the prosecutor and the Judge. My husband's attorney filed a sealed continuance, but Mr. Laurans handed the sent note to Mrs. Brown with what I feel he did with no acknowledgement of my son's request for confidentiality.

7

This note was addressed to Adam DeJong from his doctor and sent by me for him as he was hospitalized. When Mrs. Brown received this note she had her agents call repeatedly to Adam's doctor for verification, only to upset my son who was then being asked why the FBI was calling about him from his doctors after had had just had surgery. My husband's attorney Mrs. Holloman-Hughes was upset and believed the prosecutor should believe information given from a defense attorney, but didn't know about how she received the note. She was informed that the sentencing was continued. Later that evening I received a call from Mr. Laurans informing of the continuance and about Mrs. Holloman-Hughes being upset to find out he handed over the note. He stated Mrs. Brown needed to verify, but should have believed a defense attorney too. He figured the agents got their jollies with harassing a doctor's office, the hospital and even more by calling and informing my victim and past employer of my son's illness for continuance. My son's request was not kept, but I was granted a great request to which I am thankful.

My last dealing at sentencing with Mr. Laurans was that I had to prepare myself for anything, but my wish was that I be allowed to self surrender since this is a non-violent crime, my first offense, and I had

8

been out all throughout litigation. When I state my request to Mr. Laurans, he threw up his hands and said I just don't ever stop asking for anything and that there was no way he would ask. I would have to do it myself. His actions and words to a woman who lived a life of verbal abuse scared me.

During sentencing he never referred to the letter I asked for him to present to the Judge or state anything about me personally. I had previously discussed with Mr. Laurans that I would not be able to speak and asked that he take care of it all. I was shocked with the sentence that I received from the Judge, and was too scared and shocked to say I felt Mr. Laurans did not do his best to represent me. I was even more shocked with the Judge asked for me to be handcuffed and carted away, and if the marshal wasn't fast enough to have Mr. Laurans do it. I have great regret from not standing up for myself that day, but my emotions took over from being yelled at by my attorney before the sentencing.

Throughout the time from November 30, 2011 to sentencing on April 24, 2014 I was out on my own recognizance. I only had to call every Monday to report to Tanis Humig, and then to Kimberley Peete. During this time period they only came to my home once to check on us, and there was nothing I did wrong. I had been informed I needed to pay

9

my property tax on the home, which with no income I could not do in full, so we made $100.00 payments monthly starting in August 2013 and every month there after. We also paid monthly homeowners insurance and furnished receipts of both to Ms. Humig and Ms. Peete. With our lack of income this was all we could provide as prior to our Plea Agreement signing on June 18, 2013 we had to come up with money to repair a coil in the air conditioner of the home. We had to borrow $3000.00 to repair the coil.

## SUMMARY

As for reasons for a person to turn to crime that had always been an honest person means a person should have to walk in their shoes. I will never say I do not deserve to be in prison, as I did commit a crime, but I feel my sentence was harsh after I was nothing but cooperative throughout the litigation. I believe my sentence should be what was signed in my plea agreement or at least what the PSI suggested. I lived in a verbally controlling abusive home with a husband who was an alcoholic and did not work. With being beat down emotionally and no family to turn to I had to try to keep my own family together as I value the vows of marriage to which the bible states. I did what I did for my

10

family. I had as it went along a hard time dealing with it all subconsciously and then turned to gambling. The gambling was my release, and hard to believe I did not allow myself to see what I was doing. During this time I dealt with my son having cancer and losing parents, but all things people deal with without turning to crime. These did play onto my defeated emotional state. I even dealt with inappropriate actions form my employer (the victim) because of my crime, which added to my emotional state. All of this was discussed with my attorneys, but none felt it had any bearing on my case or sentencing.

I have great regret from my crime and will never do or commit crime again. I have hurt my family by having all assets seized, and lost the trust of my husband who for 35 years of marriage was blind with trust and knew nothing of the crime and was sentenced anyway. I destroyed my marriage and must live with this crime for the rest of my life.

I'm asking that my sentencing be relooked at. This is my first offense and I was nothing but cooperative throughout litigation. I believe I was not represented to the best of my attorney's abilities throughout the trials. I put in a request for a new attorney and have not

11

heard anything back, and Mr. Laurans himself put in a motion to withdraw.

My embezzlement from my employer is of great regret to me. Since the date of my confession a great relief has came upon me as looking back I have realized I wanted to be caught as I could not live with the crime I was committing. Looking back, I cannot even believe I did what I did. But deceit is what I did to my employer. Words cannot express the regret I have for doing my crime, but I hope with my side of the story, my sentencing could be dropped to the original agreed upon sentencing in my plea agreement.

Appellate Case: 14-2072     Page: 15     Date Filed: 07/17/2014 Entry ID: 4177658